# No. 23-1871

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

PICKENS COUNTY BRANCH OF THE NAACP; REBECCA TURNER
and BRANDON TURNER, on behalf of minor children J.T. and
G.T.; SUSANNA ASHTON and PETER LAURENCE on behalf of
minor children H.L. and C.L.; REBA KRUSE and DERRICK KRUSE
on behalf of minor children S.K. and R.K.,

*Plaintiff-Appellants*,

v.

SCHOOL DISTRICT OF PICKENS COUNTY,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of South Carolina
No. 8:23-cv-01736-BHH
Hon. Bruce H. Hendricks

---

## BRIEF OF PLAINTIFF-APPELLANTS

---

Allen Chaney
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Anna Kathryn Barry
NAACP
915 15th Street NW
Washington, DC 20005
(202) 548-6610
abarnes@naacpnet.org

*Counsel for Plaintiff-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Appellate Rule 26.1, Plaintiff-Appellants collectively state that they are not a publicly held corporation, other publicly held entity, or trade association; that they do not issue shares to the public and has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad; that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; and that the case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................... i

TABLE OF AUTHORITIES ...........................................................................v

INTRODUCTION...........................................................................................1

JURISDICTIONAL STATEMENT .................................................................3

STATEMENT OF ISSUES ............................................................................3

STATEMENT OF THE CASE .......................................................................4

   I.        Statement of Facts.............................................................................4

     A.      The School District of Pickens County .................................4

     B.      *Stamped: Racism, Antiracism, and You*...................................5

         1.      *Stamped* is age appropriate, educationally suitable, and aligns with many South Carolina standards for English Language Arts.........................................................................6

     C.      The Challenge to *Stamped* ........................................................8

         1.      Parental Challenges to *Stamped*..................................8

         2.      School-Level Review.........................................................9

         3.      District-Level Appeal and Review ...................................10

         4.      Public comments explicitly politicized the Board's consideration of *Stamped*.....................................................11

     D.      Political Pressure to Remove *Stamped* ...................................13

         1.      Moms for Liberty ..............................................................13

         2.      South Carolina Freedom Caucus .....................................15

3.    Conservatives of the Upstate............................................18

E.    Removal of *Stamped* ....................................................19

F.    Partial reinstatement of *Stamped* ................................21

II.    Preliminary Injunction Litigation.....................................22

STANDARD OF REVIEW .........................................................23

SUMMARY OF ARGUMENT....................................................23

ARGUMENT ..............................................................................25

I.    The Court should reverse the district court and grant Plaintiffs'
motion for preliminary injunctive relief. ........................................25

A.    Plaintiffs established that they are likely to prevail on the
merits................................................................................26

1.    The District's restriction on *Stamped* infringed on
Plaintiffs' First Amendment right to access information
in their classrooms and libraries without undue,
viewpoint-based censorship. ................................26

2.    The District did not carry its burden to show that its
prohibition on curricular use of *Stamped* was reasonably
related to a legitimate pedagogical interest. ....................35

3.    The District did meet its burden under *Tinker* or *Pico* to
justify its restriction on access to *Stamped* in the library.
...........................................................................41

4.    The Board's partial reinstatement of *Stamped* in District
libraries does not preclude preliminary injunctive relief.
...........................................................................46

B.    Plaintiffs established they are likely to suffer irreparable
harm absent preliminary relief. ................................47

C.      Plaintiffs established both that the balance of equities and the public interest favor preliminary injunctive relief...................48

D.      Outright reversal, instead of remand, is appropriate because the undisputed documentary evidence demonstrates that Plaintiffs satisfied the *Winter* factors. ......................................49

II.     In the alternative, the district court's order should be vacated and remanded with instructions to apply *Kuhlmeier* to Plaintiffs' curricular claim and *Tinker* or *Pico* to Plaintiffs' library removal claim. ................................................................................................51

III.    At minimum, the district court's order denying relief should be vacated and remanded for compliance with Fed. R. Civ. P. 52. ..52

CONCLUSION........................................................................................53

# TABLE OF AUTHORITIES

### Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 439 F. Supp. 2d 1242 (S.D. Fla. 2006)........................................................................................43

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)..............................................................................39, 42, 43, 46

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ......................................40

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ................................................29

*B.L. by and through Levy v. Mahanoy Area Sch. Dist.*, 376 F. Supp. 3d 429 (M.D. Pa. 2019)...............................................................................32, 34

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) .................................................................................... passim

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)...................................32

*Booker v. Timmons*, 644 F. App'x 219 (4th Cir. 2016) ...............................55, 59

*Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364 (4th Cir. 1998)...........57

*Bratcher v. Clarke*, 725 F. App'x 203 (4th Cir. 2018).......................................59

*C.K.-W by and through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906 (E.D. Mo. 2022) ........................................................................38

*Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995) 38, 40, 47

*Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864 (D. Kan. 1995) ..... passim

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ..........3, 53

*Coble v. Lake Norman Charter Sch., Inc.*, 499 F. Supp. 3d 238 (W.D.N.C. 2020)........................................................................................54

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998).........................53

*Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) ..........51

*Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010) .......................................34

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ........................................................................44

*Elrod v. Burns*, 427 U.S. 347 (1976)................................................52

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...................................................................51, 52

*Genovese Drug Stores, Inc. v. Connecticut Packing Co., Inc.*, 732 F.2d 286 (2d Cir. 1984) .................................................................55

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002).....................54

*Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426 (4th Cir. 2013)....32, 34, 48

*Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) ............... passim

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) .58

*In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018) ...............................52

*Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004).....................53

*Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978)........................................2, 52

*King v. C. I. R.*, 458 F.2d 245 (6th Cir. 1972)................................................28, 55

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ...............................................30

*Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565 (4th Cir. 2011) .......................47

*Kreimer v. Bureau of Police for Town of Marrison*, 958 F.2d 1242 (3d Cir. 1992).......................................................................31

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021)..................................................................54

*League of Women Voters of N.C.*, 769 F.3d 224 (4th Cir. 2014) ......................26

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ................................................31

*Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310 (1940) ....................58

*McCarthy v. Fletcher*, 207 Cal. App. 3d 130 (Cal. Ct. App. 1989) ....................40

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................................30

*Morse v. Frederick*, 551 U.S. 393 (2007) ................................................33

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)..............2, 53

*Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012)..................54

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008)........................................54

*Pico v. Bd. of Educ.*, 474 F. Supp. 387 (E.D.N.Y. 1979) ....................................35

*Pico v. Bd. of Educ.*, 638 F.2d 404 (2d Cir. 1980) ....................................35, 36, 49

*Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982).......................................................................................... passim

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)........................30

*Right to Read Def. Comm. v. Sch. Comm. of Chelsea*, 454 F. Supp. 703 (D. Mass. 1978) ................................................................................38

*Romano v. Harrington*, 725 F. Supp. 687 (E.D.N.Y. 1989)............................46

*Rullan v. Goden*, 782 F. App'x 285 (4th Cir. 2019) ................................27, 58, 59

*S.C. Freedom Caucus v. Charleston Cnty. Sch. Dist.*, 2022-CP-1005451 (Nov. 28, 2022)..........................................................................................18

*S.C. Freedom Caucus v. Lexington Sch. Dist. One*, 2022-CP-3203931 (Nov. 16, 2022)..........................................................................................18

*Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175 (3d Cir. 2010).....55

*Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001)..........................34

*Sbicca-Del Mac, Inc. v. Milius Shoe Co.*, 145 F.2d 389 (8th Cir. 1944)...........55

*Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679 (D. Me. 1982)...................30

*Shelton v. Tucker*, 364 U.S. 479 (1960) ................................................30

*Spartan Concrete Products, LLC v. Argos USVI, Corp.*, 929 F.3d 107 (3d Cir. 2019)...........................................................................................3, 55

*St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327 (D. Md. 2021) ................................................................44

*Thomas v. Andino*, 613 F. Supp. 3d 926 (D.S.C. 2020) ....................................53

*Tinker v. Des Moines Comm. Sch. Dist.*, 393 U.S. 503 (1969)................ passim

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................42, 44

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517 (11th Cir. 1989) ...33, 40

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................29

### Statutes

28 U.S.C. § 1292 ................................................................................3

28 U.S.C. § 1331 ................................................................................3

42 U.S.C. § 1983 ................................................................................3

S.C. Code Ann. § 59-17-10................................................................4

### Rules

Fed. R. Civ. P. 52 .......................................................................... passim

### Other Authorities

"Marxism," Merriam-Webster.com Dictionary (last 6/6/23) ...........................42

@COTUleadership, X (Sept. 26, 2022, 8:15 PM) ................................18

9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed. 2008)...........................................................................................48

*A Conversation With Jason Reynolds and Ibram X. Kendi*, National Council of Teachers of English (NCTE) (last visited Apr. 5, 2023)................................7

Amanda Hollensbee (@HollensbeeAmanda), X (Jan. 6, 2023, 8:43 PM)........15

Amy Williams, *School Board Member Speaks Up About Inappropriate Books in SDPC*, Conservatives of the Upstate (Nov. 23, 2022).............13, 43

Annabel Gutterman, *Jason Reynolds and Ibram X. Kendi Are Teaming Up to Help Young People Navigate Racism*, TIME (Aug. 19. 2019)..................6

Dylan Craig, *Moms for Liberty Takes the National Stage*, Leadership Institute (July 22, 2022) ......................................................................15

Emma Parkhouse, *Teachers, librarians & parents argue banning books in HCS will hurt students*, ABC15 News (January 23, 2023)...........................14

Estellene P. Walker, *"So Good and Necessary a Work": The Public Library in South Carolina, 1698-1980*, (Columbia: South Carolina State Library, 1981)......................................................................................................20

H.B. 3728 ("South Carolina Transparency and Integrity in Education Act"), 125th Gen. Assemb., 1st Reg. Sess. (S.C. 2023) ..............................................17

Jo Napolitano, *74 Interview: Moms for Liberty Co-Founder Tina Descovich on Her Group's Stunning Growth, Facing Threats Herself as a School Board Member and Googling Koch Brothers*, The 74 (Nov. 1, 2021)..........14

Johnnelle Raines, *Daniel High School Teacher's Note to Parents About the Book STAMPED*, Conservatives of the Upstate (Aug. 25, 2022)................13

Johnnelle Raines, *Victory for WE THE PEOPLE at School Board Meeting*, Conservatives of the Upstate (Sept. 30, 2022)..................................................18

Joseph Bustos, *3 Bills Would Restrict Transgender Care After MUSC Halts Hormonal Therapy for Kids*, The State (Dec. 20, 2022)................................16

Kathryn Varn, *DeSantis to conservative Moms for Liberty: 'You gotta stand up, and you gotta fight.'* Tallahassee Democrat (July 15, 2022) ..................15

Luke Campbell, *Is It Really Banning Books?*, Conservatives of the Upstate (Mar. 30, 2023)......................................................................................................18

*Moms for Liberty Awarded Heritage's Salvatori Prize for Citizenship*, Heritage Foundation (Jun 2, 2022)......................................................15

Moms For Liberty, Facebook (May 24, 2021, 5:27 PM)...................................15

Olivia Little, *Unmasking Moms for Liberty*, Media Matters for America (Nov. 12, 2021) ...........................................................................................15

Patrick McCreless, *What is the SC Freedom Caucus Supporting the Abortion Death Penalty Bill? 5 Things to Know*, The State (March 15, 2023).......................................................................................................16

*SDPC Bd. of Trustees – Called Bd. Meeting (Virtual) – 7/6/23*, YouTube (last accessed Oct. 4, 2023) ...........................................................................21

*SDPC Bd. of Trustees Meeting (In-Person) – 08/22/22*, YouTube (last accessed Oct. 3, 2023) ...........................................................12, 13, 17, 42

*SDPC Bd. of Trustees Meeting (In-Person) – 09/26/22*, YouTube (last accessed Oct. 3, 2023) ................................................................. passim

*Stamped: Racism, Anti-Racism, and You*, Cooperative Children's Book Center, School of Education, University of Wisconsin-Madison (June 8, 2020)..................................................................................................6, 7

*Stamped: Racism, Anti-Racism, and You*, NEA (last visited June 22, 2023)6, 7

*Stamped: Racism, Anti-Racism, and You*, SCHOLASTIC (last visited June 22, 2023)..........................................................................................................6

State Freedom Caucus Network (last accessed Oct. 3, 2023) .........................16

Thomas Beach (@ThomasBeach), X (Sept. 27, 2022, 8:16 AM).......................17

Thomas Beach, *Op-Ed: The Reason Behind the Freedom Caucus*, Palmetto State Watch (Mar. 10, 2023) .......................................................................17

*Where I Stand On Local Issues Specific to District 4*, Matthew Kutilek for State House (last accessed June 26, 2023).....................................................12

*Who We Are*, Moms for Liberty (last accessed Oct. 3, 2023)...........................13

x

## INTRODUCTION

On September 26, 2022, the Board of Trustees (the "Board") for the School District of Pickens County ("SDPC" or the "District") voted unanimously to remove access to *Stamped: Racism, Antiracism, and You* ("*Stamped*")—a book about the history of racist ideas in America—from every District library, media center, and classroom. The decision was not motivated by the book's educational suitability (two different review committees concluded that the book was aligned with dozens of state standards and highly suitable for use as an instructional resource) but by ideological opposition to the viewpoints articulated in the book. Following the District's action, Plaintiffs—six parents and one organization with members in the District—filed a lawsuit in the district court and moved for a preliminary injunction to restore access to the book. Without making any findings of fact or conclusions of law—indeed, without explaining what legal standard governed Plaintiffs' claims—the district court orally denied the motion. This appeal followed.

Plaintiffs met their burden under *Winter* and are entitled to preliminary injunctive relief. The District's removal of *Stamped* triggers First Amendment scrutiny because it infringes upon the rights of students to access information in their libraries and classrooms. Under established precedent, the District was required to show that its removal of the *Stamped* from the classroom was "reasonably related to legitimate pedagogical

1

concerns," *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), that its removal from the library and media center was necessary to avoid "substantial interference with schoolwork or discipline," *Tinker v. Des Moines Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969), and that the book was not removed "because [the District] dislike[s] the ideas contained in those books and seek[s] by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982).

Defendant failed to meet its burden. Board members expressed no interest in *Stamped*'s educational suitability. Instead, it was opposition to the *opinions* contained in the book—and a desire to suppress the proliferation and discussion of those ideas—that motivated political groups to challenge the book and that drove the Board's decision to remove the book. As the Supreme Court has said: "Such purposes stand inescapably condemned by our precedents." *Pico*, 457 U.S. at 872.

In a First Amendment case such as this, "the likelihood of success on the merits is the dominant, if not the dispositive, factor" for granting or denying a preliminary injunction. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). That is because a First Amendment injury is *per se* irreparable, *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978), and the public interest and balance of equities are "established when there is a likely First Amendment violation," *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Therefore, Plaintiffs' likelihood of success

sufficiently satisfies each of the four *Winter* factors and entitles them to preliminary injunctive relief.

On appeal, Plaintiffs argue that although the district court's failure to make findings of fact or conclusions of law violates Fed. R. Civ. P. 52(a), the documentary and undisputed evidence in the record "could support only one conclusion," *Spartan Concrete Products, LLC v. Argos USVI, Corp.*, 929 F.3d 107, 111 n.1 (3d Cir. 2019), and therefore permits the Court to **reverse** the district court and **grant** Plaintiffs' motion. If, however, the Court determines that there are unresolved questions of material fact, then Plaintiffs urge the Court to **remand** the case to the district court for additional fact finding and with instructions to apply the appropriate legal standards to Plaintiffs' First Amendment claims.

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action under 42 U.S.C. § 1983, and the district court properly exercised jurisdiction under 28 U.S.C. § 1331. Plaintiffs filed a timely notice of appeal on August 16, 2023, JA283, and this Court has jurisdiction to review the district court's interlocutory order denying an injunction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

I.      Whether the Court should reverse the district court and grant the Plaintiffs' motion for preliminary injunction because the documentary

3

and/or undisputed evidence shows that Plaintiffs satisfied the *Winter* factors and are entitled to relief.

II.     In the alternative, whether the Court should remand for the district court to make factual findings under Fed. R. Civ. P. 52(a), but with instructions for the district court to apply *Kuhlmeier* to Plaintiffs' challenge to the District's prohibition on *Stamped* in the classroom and *Tinker* or, in the alternative, *Pico* to the District's removal of *Stamped* from District libraries.

III.    In the alternative, whether the Court should vacate the district court's ruling and remand for the district court to make findings of fact and conclusions of law sufficient to support its ruling and to satisfy its obligations under Fed. R. Civ. P. 52(a).

## STATEMENT OF THE CASE

### I.   Statement of Facts

#### A.   The School District of Pickens County

The School District of Pickens County is responsible for administering public K-12 education in Pickens County, South Carolina. Under South Carolina law, the District is a "body politic and corporate" that "may sue and be sued." JA81 (District Legal Status) (citing S.C. Code Ann. § 59-17-10). At present, the District is governed by an all-white, seven-member Board of Trustees that is responsible for "ensuring that students develop to their maximum personal and academic potential to prepare them for the future in

4

the workforce and as responsible citizens." JA82 (Board Operational Goals).
To that end, the Board is also responsible for approving and adopting
textbooks for use in the school system. Under District policy, "[t]he board's
first commitment in the selection and adoption of textbooks will be the
preservation of the student's right to learn in an atmosphere of academic
freedom." JA83 (Textbook Selection and Adoption). The Board has ultimate
and final authority for operating schools in the District. JA85–86 (Board
Powers and Duties).

      B.    *Stamped: Racism, Antiracism, and You*

     *Stamped: Racism, Antiracism, and You* is a young adult adaptation of
Ibram X. Kendi's  award-winning book, *Stamped from the Beginning*, which
traces the history of racist thought in America.[1] It is a #1 New York Times
bestseller, received book-of-the-year honors from *Parents Magazine* and
*Publishers Weekly*, was awarded Best Children's Book of the Year by
*Washington Post*, and was listed on *TIME Magazine*'s Ten Best Children's
and Young Adult Books of the Year.

---

[1] *Stamped from the Beginning* is a highly regarded book on racist thought in
America. It  won the 2016 National Book Award for Nonfiction and the 2017 NAACP
Image Award for  Outstanding Literary Work – Nonfiction. It was a finalist for the
National Book Critics Circle  Award for General Nonfiction in 2016 and a nominee for the
2017 Hurston/Wright Legacy  Award for Nonfiction. The young adult adaptation,
*Stamped: Racism, Antiracism, and You*, was  published by Kendi and celebrated young
adult author Jason Reynolds in 2020.

1. ***Stamped* is age appropriate, educationally suitable, and aligns with many South Carolina standards for English Language Arts.**

*Stamped* is written specifically for young adult readers. According to author Jason Reynolds, he "rewrote the book top to bottom" to ensure the subject matter is accessible to  young people.[2] Readers and educators around the country have deemed the book appropriate for  teen readers.[3]  University of Madison-Wisconsin School of Education's Cooperative Children's Book Center lists the book as appropriate for ages 12 and older.[4]

*Stamped* is widely recognized by educators as appropriate and relevant to classroom  instruction.[5] The National Council of Teachers of English recommends the book for classroom instruction and provides a free educator's guide.[6] The guide encourages educators "to think about this text through the lens of their state-  specific and national standards."[7]

---

[2] Annabel Gutterman, *Jason Reynolds and Ibram X. Kendi Are Teaming Up to Help  Young People Navigate Racism*, TIME (Aug. 19. 2019), https://time.com/5650322/jason-reynolds-ibram-kendi-stamped-young-adult/.

[3] Scholastic classifies the book as appropriate for ages 12-18 or grades 7-12. *Stamped: Racism, Anti-Racism, and You*, SCHOLASTIC (last visited June 22, 2023), https://shop.scholastic.com/parent-ecommerce/books/stamped-racism-antiracism-  and-you-9780316453691.html.

[4] *Stamped: Racism, Anti-Racism, and You*, Cooperative Children's Book Center, School of Education, University of Wisconsin-Madison (June 8, 2020), https://ccbc.education.wisc.edu/stamped-racism-anti- racism-and-you/.

[5] *See* NEA, *supra* note 4; Cooperative Children's Book Center, *supra* note 5.

[6] *A Conversation With Jason Reynolds and Ibram X. Kendi*, National Council of Teachers of English (NCTE) (last visited Apr. 5, 2023), https://ncte.org/stamped-resources/.   This educator's guide is available on the NEA website. NEA, *supra* note 4.

[7] NEA, *supra* note 4.

6

As relevant here, *Stamped* closely aligns with many of South Carolina Department of Education's ("SC DOE") standards for English Language Arts ("ELA"). SC DOE issues "Priority Standards," which "represent the assured student competencies that each teacher needs to help every student learn, and demonstrate proficiency in, by the end of the current grade or course." *See* JA91 (ELA Priority and Support Learning Standards). Many of these standards relate to analyzing, interpreting, and responding to informational and persuasive writing.

The skills required by SC DOE's ELA standards are directly aligned with the skillset students must use to read and understand *Stamped*. For example, Standard RI.5 for English I and II requires students to "[d]etermine meaning and develop logical interpretations by making predictions, inferring, drawing conclusions, analyzing, synthesizing, providing evidence and investigating multiple interpretations" when reading informational texts. JA96–97 (SCCCR Standards OnePager English 1). Additionally, Standard RI.10.1 for English I teaches students to identify when and how authors use rhetorical devices to advance their points of view, mandating that students understand how to "determine an author's point of view or purpose in a text and analyze how an author uses rhetoric to advance that point of view or purpose." JA97. At the English III level, Standard RI.11.1 requires that students be taught to "analyze how point of view and author's perspective and purpose shape content, meaning, and style, supports rhetorical or aesthetic purposes, and conveys cultural experience."

7

JA92. A supporting standard requires that students learn to analyze an author's use of "diction, conventions, figurative language, and/or language that is particularly fresh, engaging, or beautiful." JA93.

To develop the skills required by these ELA standards and others, students in South Carolina public schools must read texts that exemplify these qualities and provoke discussions pertinent to these standards. *Stamped* blends historical evidence, persuasive rhetoric, and accessible style to explore American identity through the lens of race, specifically by discussing historical events like the Revolutionary War, the Civil War, World Wars I and II, *Brown v. Board of Education*, and more, while introducing readers to historical figures such as Thomas Jefferson, John C. Calhoun, Frederick Douglass, Marcus Garvey, Angela Davis, and others. *Stamped* provides ample opportunities for high school teachers and students to explore and apply the State's ELA reading standards to their understanding of the text.

### C.    The Challenge to *Stamped*

#### 1.    **Parental Challenges to *Stamped***

In August 2022, three parents complained of the use of *Stamped* at D.W. Daniel High School ("D.W. Daniel"), a high school in the District. One parent-challenger, Susan Jo Van Fleet, argued that although she had not read *Stamped*, it should be removed from any public school or public library because it "promote[s] socialism." JA121 (Board Packet). Another

8

challenger, Amanda Hollensbe, argued that "no one should read [*Stamped*]" because it "demonstrates radical Marxism infecting our schools and our culture." JA111. Ms. Hollensbe attached many pages of supporting materials to her challenge and argued that the book's existence in District schools violated South Carolina's supposed "anti-CRT" budget proviso. JA 111. Jessica Rae Martin, the third challenger of *Stamped* at D.W. Daniel, argued it should be removed because it constitutes "objectible [sic] indoctrination" and complained of the author's use of the word "basically" to insert his own interpretation of an event or subject. JA123–27.

## 2.    School-Level Review

In accordance with the District's policy for challenging instructional materials, JA136–137, D.W. Daniel convened a committee to resolve the challenges, JA128–130. The committee read the book and reviewed the parent complaints, the South Carolina ELA standards, and Budget Proviso 1.105. JA128–130. It then spoke directly with the English teacher who was using the text. Following this review, the committee concluded that (1) the way *Stamped* was being used "does not amount to inculcating students into any theory or perspective" and (2) the proposed use of *Stamped* "aligns with SC ELA standards." JA128. The school-level committee unanimously agreed that the text was developmentally appropriate and that it enables students to "analyze accuracy, tone, argument, and bias[.]" JA128. The full committee then recommended that *Stamped* should remain as a resource available to

students at D.W. Daniel, "whether in a classroom or on a bookshelf." JA128. In support of this conclusion, the committee cited 27 ELA standards that are furthered by reading and analyzing *Stamped*, including reading, writing, communication, and literary-based standards. JA129–30.

### 3.    District-Level Appeal and Review

Following this school's determination, one parent-complainant— Amanda Hollensbe—appealed the decision to the District. JA131–133. In response to her appeal, the District superintendent convened a district-level review committee. *See* JA134–135, JA137. The District committee— comprised of a district-level curriculum coordinator, a media specialist/instructional coach in the school district, a teacher with special competence in the questioned field, a parent of a child enrolled in the school, and a superintendent's own designee—reviewed the parent's complaint and appeal, read the entirety of *Stamped*, and reviewed the school-level findings and response. JA134–137. Following that review, the district-level committee unanimously recommended that *Stamped* be approved as a classroom instructional resource for high school students. JA138–139. The book was approved as either a "choice selection" or a "whole-class instruction" with an alternate assignment. JA134–137. The committee also agreed that *Stamped* should remain in high school classrooms, libraries, and media centers. JA134–135. The committee noted that "[t]he teacher's communicated purpose for use and alignment with the standards is important to articulate

10

the intent for selection of this book," and unanimously "agreed [with the school-level committee] that [*Stamped*] is developmentally appropriate for high school students to analyze accuracy, tone, argument, and bias." JA134–135.

### 4. Public comments explicitly politicized the Board's consideration of *Stamped*.

Ms. Hollensbe submitted her initial challenge to *Stamped* on August 22, 2022—the same day the Board was scheduled to hold its monthly public meeting. *See* JA112. Although D.W. Daniel had only just received the challenge and there was not yet any reason for the Board to know about the challenge, several members of the public were in attendance that evening to express their own disapproval of *Stamped*. Notably, many speakers were political actors who couched their strident opposition to *Stamped* in explicit political and ideological terms.

Matthew Kutelik, who recently lost a Republican primary bid to serve in the State House, told the Board he would "fight to the death to ensure that [his] daughters and the sons and daughters of the people in [the] crowd . . . are not being indoctrinated by a racist, anti-American, Marxist ideology perpetrated by Ibram X. Kendi." SDPC Board of Trustees Meeting (In-Person) – 8/22/22 ("8/22/22 Board Meeting") at 1:20:28.[8] He then addressed the Board saying, "I ask you to fight the same and do the same thing." *Id.* at

---

[8] *SDPC Bd. of Trustees Meeting (In-Person) – 08/22/22*, YouTube (last accessed Oct. 3, 2023), https://www.youtube.com/live/foSnC9OaF9E?feature=share&t=4828.

11

1:20:46. Mr. Kutelik's campaign website for his State House campaign shares his views on local school issues, arguing that "[t]he purpose of schools is not indoctrination of the latest woke and destructive ideology."[9]

Another South Carolina politician, Thomas Beach, a freshman state representative from Pickens County, appeared to share his own strong opposition to *Stamped*. 8/22/22 Board Meeting at 1:25:26. Mr. Beach identified himself as a member of the Freedom Caucus and warned the Board that, unless it removed Stamped, it could face adverse action from the Freedom Caucus. *Id.* at 1:26:48. Another speaker echoed this political opposition, arguing that "critical race theory . . . [is] a neo-Marxist theory" with a goal of "hav[ing] a Marxist revolution." *Id.* at 1:31:23. One speaker, Johnelle Raines, who is affiliated with the political organization Conservatives of the Upstate ("COTU"), voiced her belief that District teachers, principals, and administrators are "ignoring the law" by asking students to read and discuss *Stamped*. *Id.* at 1:15:15. Raines, along with Board Member Amy Williams, has voiced her concerns about challenged books on the COTU website.[10]

---

[9] *Where I Stand On Local Issues Specific to District 4*, Matthew Kutilek for State House (last accessed June 26, 2023), https://votematthewkutilek.com/.

[10] Johnnelle Raines, *Daniel High School Teacher's Note to Parents About the Book STAMPED*, Conservatives of the Upstate (Aug. 25, 2022), https://www.conservativesoftheupstate.com/2022/08/daniel-high-school-teachers-note-to.html; Amy Williams, *School Board Member Speaks Up About Inappropriate Books in SDPC*, Conservatives of the Upstate (Nov. 23, 2022), https://www.conservativesoftheupstate.com/2022/11/school-board-member-speaks-up-about.html.

Following community comments, Board Member Kelley opened the discussion up for comments from the Board. During this conversation, Board member Williams shared she "[has] extremely strong political leanings" and "most people in this room know which way I lean." 8/22/22 Board Meeting at 1:54:26. She said that she agreed with two of the speakers, including the original book challenger, Ms. Hollensbe. *Id.*

### D. Political Pressure to Remove *Stamped*

#### 1. Moms for Liberty

Several of the loudest voices that lobbied to remove *Stamped: Racism, Antiracism, and You* were women who are formally affiliated with Moms for Liberty ("M4L"). Although Moms for Liberty cloaks its mission in anti-indoctrination "parents' rights" rhetoric,[11] its national, state, and local campaigns show that the group is exclusively dedicated to pressuring educators to adhere to the group's socially conservative ideology. In service of that mission, South Carolina chapters of M4L have pushed for the viewpoint-based removal of dozens of books that span a number of topics, including books that discuss race (*The Bluest Eye* by Toni Morrison), gun violence (*People Kill People* by Ellen Hopkins), sexism and Christian fundamentalism (*The Handmaid's Tale* by Margaret Atwood), and sexuality (*All Boys Aren't Blue* by George M. Johnson).[12] And despite portraying

---

[11] *See Who We Are*, Moms for Liberty (last accessed Oct. 3, 2023), https://www.momsforliberty.org/about/.

[12] *See, e.g.*, Emma Parkhouse, *Teachers, librarians & parents argue banning books in HCS will hurt students*, ABC15 News (January 23, 2023), https://wpde.com/newsletter-

13

themselves as a grassroots organization with minimal resources,[13] M4L has

been embraced, endorsed, and financially supported by groups and figures

like Ron DeSantis,[14] Glen Beck,[15] Leadership Institute,[16] and the Heritage

Foundation.[17]

Amanda Hollensbe, one of the three original complainants and the only

parent to challenge the school-level review finding, is the secretary of the

Pickens Branch of M4L.[18] Heather Mitchell, Chair for the Pickens County

---

daily/horry-county-teachers-librarians-parents-banning- booksstudents-library-english-moms-for-liberty-south-carolina.

[13] *See, e.g.*, Jo Napolitano, *74 Interview: Moms for Liberty Co-Founder Tina Descovich on Her Group's Stunning Growth, Facing Threats Herself as a School Board Member and Googling Koch Brothers*, The 74 (Nov. 1, 2021), https://www.the74million.org/article/74-interview-moms-for-liberty-cofounder-tina-descovich-on-her-groups-stunning-growth-facing-threats-herself-as-a-school-board-member-and-googling-koch-brothers/ (claiming that M4L is funded by small donations and selling t-shirts).

[14] "Gov. Ron DeSantis had a salient message for [Moms for Liberty national summit attendees] . . . he is one of them." Kathyrn Varn, *DeSantis to conservative Moms for Liberty: 'You gotta stand up, and you gotta fight.'* Tallahassee Democrat (July 15, 2022), https://www.tallahassee.com/story/news/2022/07/15/desantis-praises-moms-liberty-education- campaign-summit/10029200002/.

[15] In a video posted to the official Moms for Liberty Facebook account, Glenn Beck voices support for the group and declares, "if you want a grassroots organization that is trying to stop what is happening into our schools, especially with CRT, Moms for Liberty . . . is doing that." Moms For Liberty, Facebook (May 24, 2021, 5:27 PM), https://www.facebook.com/Moms4Liberty/videos/glenn-beck-loves-moms-for-liberty/1024730941688808/.

[16] Leadership Institute was the top sponsor of Moms for Liberty's 2022 National Summit. *See* Dylan Craig, *Moms for Liberty Takes the National Stage*, Leadership Institute (July 22, 2022), https://www.leadershipinstitute.org/news/?NR=16004.

[17] *Moms for Liberty Awarded Heritage's Salvatori Prize for Citizenship*, Heritage Foundation (Jun 2, 2022), https://www.heritage.org/press/moms-liberty-awarded-heritages-salvatori-prize-citizenship.

[18] Amanda Hollensbee (@HollensbeeAmanda), X (Jan. 6, 2023, 8:43 PM), https://twitter.com/HollensbeAmanda/status/1611538874974765056?s=20 ("Thank you! I'm the secretary for Moms for Liberty, Pickens County SC. I love my joyful warrior M4L members!").

14

chapter of M4L, testified at the Board's September 26, 2022, meeting that *Stamped* should be removed *because of* its political stances and threatened to work to oust any Board member that voted to retain the book. SDPC Board of Trustees Meeting (In-Person) – 9/26/22 ("9/26/22 Board Meeting") at 1:22:20[19] ("Say no to *Stamped*, just like you would *Mein Kampf*.")

### 2.      South Carolina Freedom Caucus

The South Carolina Freedom Caucus ("SC Freedom Caucus") is an ultra-conservative special interest caucus in the South Carolina House of Representatives. SC Freedom Caucus is part of the "State Freedom Caucus Network," which helps to enlist "patriots" in state politics to fight for states' rights.[20] SC Freedom Caucus is comprised of twenty members, all of whom are white. In its brief existence, SC Freedom Caucus has bullied the Medical University of South Carolina into halting pediatric gender affirming care[21] and has advanced a bill that would make abortion punishable by the death penalty.[22]

---

[19] *SDPC Bd. of Trustees Meeting (In-Person) – 09/26/22*, YouTube (last accessed Oct. 3, 2023), https://www.youtube.com/watch?v=I4oy4tp1Oi8&list=PL74BF154C41BFD009&index=12.

[20] State Freedom Caucus Network (last accessed Oct. 3, 2023), statefreedomcaucus.org.

[21] Joseph Bustos, *3 Bills Would Restrict Transgender Care After MUSC Halts Hormonal Therapy for Kids*, The State (Dec. 20, 2022), https://www.thestate.com/news/politics-government/article270044452.html.

[22] Patrick McCreless, *What is the SC Freedom Caucus Supporting the Abortion Death Penalty Bill? 5 Things to Know*, The State (March 15, 2023), https://www.thestate.com/news/state/south-carolina/article273183125.html.

According to the State Freedom Caucus Network, "Critical Race Theory" is one of "the most important fights of today."[23] In South Carolina, SC Freedom Caucus fought to pass Budget Proviso 1.93, which purports to prohibit state money from funding the teaching of "Critical Race Theory." The SC Freedom Caucus even brought legal actions against two different school districts—Charleston and Lexington One—for allegedly violating that budget proviso.[24] In that lawsuit, SC Freedom Caucus takes square aim at Ibram Kendi (the author of *Stamped*) and his concept of antiracism. Specifically, the lawsuit alleges that "Critical Race Theory," "antiracism," "culturally responsive teaching, or diversity, equity, and inclusion," all violate Budget Proviso 1.93 and are all "the same pernicious, racist nonsense." ECF No. 7-15 at 3. For the last two years, the SC Freedom Caucus has fought (so far, unsuccessfully) to pass a general law that would codify their anti-CRT budget proviso.[25]

---

[23] State Freedom Caucus Network, *supra* note 22.

[24] *S.C. Freedom Caucus v. Charleston Cnty. Sch. Dist.*, 2022-CP-1005451 (Nov. 28, 2022); *S.C. Freedom Caucus v. Lexington Sch. Dist. One*, 2022-CP-3203931 (Nov. 16, 2022).

[25] *See* H.B. 3728 ("South Carolina Transparency and Integrity in Education Act"), 125th Gen. Assemb., 1st Reg. Sess. (S.C. 2023), https://www.scstatehouse.gov/sess125_2023-2024/bills/3728.htm.

Thomas Beach is a state representative from the Pickens area and a member of the SC Freedom Caucus. Representative Beach is committed to fighting against "left-wing indoctrination of our kids in schools."[26] To that end, Representative Beach appeared in person at the District's August 22, 2022, board meeting and warned the Board that they could face adverse action from the SC Freedom Caucus if they refused to remove *Stamped*. 8/22/22 Board Meeting at 1:26:45. Following the Board's vote to remove *Stamped*, Beach credited his own threats as the basis for the Board's decision:[27]



Thomas ✓
@ThomasBeach

Big win in SC Pickens Co Schools. School Board removes material that taught students about oral sex and pushed CRT due to pressure from parents and threat of refund of taxpayer money for breaking state proviso laws signed by @SCFreedomCaucus members.

8:16 AM · Sep 27, 2022

---

[26] Thomas Beach, *Op-Ed: The Reason Behind the Freedom Caucus*, Palmetto State Watch (Mar. 10, 2023), https://palmettostatewatch.com/op-ed-the-reason-behind- the-freedom-caucus-by-rep-thomas-beach/.

[27] Thomas Beach (@ThomasBeach), X (Sept. 27, 2022, 8:16 AM), https://x.com/ThomasBeach/status/1574734668313894916?s=20.

### 3.    Conservatives of the Upstate

Conservatives of the Upstate ("COTU") is another influential and ultra-conservative political organization that was directly involved in the District's removal of *Stamped*. From the start, COTU expressed public support for Amanda Hollensbe, one of the original challengers, on its website.[28] It also coordinated efforts to lobby the Board to remove *Stamped*. One of the board members, Amy Williams, wrote an article for the COTU website where she expressed her views about other challenged materials.[29] When the District voted to remove *Stamped*, COTU tweeted its celebration:[30]



Even well after the book was removed, COTU continued to laud the decision and explain that it was removed because of the ideas the book contains.[31]

---

[28] Johnnelle Raines, *Victory for WE THE PEOPLE at School Board Meeting*, Conservatives of the Upstate (Sept. 30, 2022), https://www.conservativesoftheupstate.com/2022/09/victory-for-we-people-at-school-board.html.

[29] Williams, *supra* note 11.

[30] @COTUleadership, X (Sept. 26, 2022, 8:15 PM), https://x.com/COTUleadership/status/1574553337688621067?s=20.

[31] Luke Campbell, *Is It Really Banning Books?*, Conservatives of the Upstate (Mar. 30, 2023), https://www.conservativesoftheupstate.com/2023/03/is-it-really-banning-

E.     Removal of *Stamped*

The Board voted on Ms. Hollensbe's District-level challenge to
*Stamped* on September 26, 2022. Prior to the vote, the Board again heard
public comments about whether *Stamped* should be available to students in
the District. 9/26/22 Board Meeting at 1:22:00.

Like the month before, political conservatives showed up to oppose
*Stamped* based on their ideological opposition to the views expressed in the
book. *See id.* at 1:22:00–1:24:50. Heather Mitchell—Chair for the Pickens
County chapter of Moms for Liberty—argued that the book is "political and
biased to the point of being propaganda," and that it "openly embrac[es]
Marxism." *Id.* at 1:23:32. She also said she opposed the book because it
"idoliz[ed] Angela Davis," who she described as "a Marxist [and] member of
the Communist Party USA." *Id.* at 1:23:55. She warned that if the Board
voted to allow "Marxist ideology to become required reading," Moms for
Liberty would campaign for a "liberty-minded candidate" to run against
them in their next election. *Id.* at 1:24:50.

After receiving public comment, the assistant superintendent
presented the Board with the District-level review committee's conclusion
that *Stamped* is educationally suitable and ought to remain available as a
classroom and library resource. *Id.* at 2:12:40.

---

books.html) (arguing that failing to remove *Stamped* would have been tantamount to
"child abuse").

19

Following the assistant superintendent's presentation (but without mention of it) Board member Phillip Bowers immediately moved to remove *Stamped* "from our classrooms and any use in our schools whatsoever for a period of five years." *Id.* at 2:13:53. That motion instantly received a second from Board member Brian Swords. *Id.* at 2:14:06. During the discussion on the motion, one Board member commented that "I don't think taxpayers should be paying [for *Stamped*]." *Id.* at 2:14:47. Another Board member remarked that the book isn't appropriate "anywhere in any school in any district." *Id.* at 2:16:08. Another Board member added that "I think we all agree this is an opinion piece. I read it. It doesn't belong in the classroom." *Id.* at 2:23:26. Board member Amy Williams specifically addressed the Supreme Court case, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), but argued that even though the Court held that removing books is "tantamount to limiting someone's First Amendment right," it was irrelevant to the Board's decision because *Pico* was "back in 1982" and "we now have Amazon [and] public libraries."[32] *Id.* at 2:20:00. For those reasons, she advised her fellow Board members that it was "clearly in our purview to decide if this [book] is appropriate or not." *Id.* at 2:20:45. The

---

[32] America's first public library was established in South Carolina in 1698, almost 200 years prior to *Pico*. Estellene P. Walker, *"So Good and Necessary a Work": The Public Library in South Carolina, 1698-1980*, (Columbia: South Carolina State Library, 1981), pp. 1-4 http://www.libsci.sc.edu/histories/vts/epw01.html#:~:text=The%20first%20publicly%20supporte d%20library,Episcopal%20clergyman%20of%20that%20period..

Board briefly discussed the possibility of allowing student access in the library with signed and witnessed parental consent, but that motion was voted down. *Id.* at 2:18:30, 2:28:30. After that was resolved, the Board voted 7-0 to completely remove *Stamped* from every District library, classroom, and media center for five years. *Id.* at 2:28:47.

Several important considerations were conspicuously absent from the Board's deliberation. To start, District policy requires the Board's final determination to be "based upon . . . [a] review of the district-level committee's findings." JA137. Despite that, the Board members completely ignored both the committee's conclusions and justifications. Board policy also requires the Board to "carefully consider the rights, freedoms, and responsibilities of students, parents/legal guardians, and teachers." JA83. Among those, Board policies especially highlight "the preservation of the student's right to learn in an atmosphere of academic freedom" and the "rights of all students" to receive instructional materials that "are aligned to the state-adopted learning standards." JA83. Again, the Board ignored these concerns and never mentioned how removing *Stamped* would infringe on academic freedom or addressed *Stamped*'s alignment with dozens of state learning standards.

F.    Partial reinstatement of *Stamped*

Ten days after Plaintiffs moved for a preliminary injunction, the Board went into executive session and voted to reinstate *Stamped* in the District's

high school libraries, subject to parental consent. JA151. Litigation counsel
was present for the meeting and the agenda item was described as an action
"for legal matters." SDPC Board of Trustees Meeting (In-Person) – 7/6/23
("7/6/23 Board Meeting") at 0:00:31.[33]

## II.    Preliminary Injunction Litigation

On June 26, 2023, Plaintiffs moved for a preliminary injunction
ordering the District to restore students' access to *Stamped* for the 2023-24
school year. JA34–72. In support, Plaintiffs submitted four declarations and
ten exhibits—including records showing the findings and conclusions of the
school- and District-level book review committees. *See* JA73–137. The motion
also extensively cites the audiovisual recordings of the Board's August 22 and
September 26 Board meetings. Each Plaintiff alleged that the Board's action
would irreparably harm their First Amendment right to access *Stamped* in
the library. Additionally, two Plaintiffs declared that they were enrolled in
the same English III Honors course where *Stamped* was assigned in the
previous school year and that the District's curricular prohibition would
irreparably harm their First Amendment right to access *Stamped* in the
classroom. JA75–78 (Turner Decl. and Laurence Decl.).

After briefing and argument, the district court denied Plaintiffs'
request for a preliminary injunction from the bench, ruling that "plaintiffs
have not made the requisite clear showing of each factor necessary for

---

[33] *SDPC Bd. of Trustees – Called Bd. Meeting (Virtual) – 7/6/23*, YouTube (last accessed Oct. 4, 2023), https://www.youtube.com/watch?v=98tIrNQNbeI&t=31s.

preliminary injunctive relief with respect to their claims." JA258. Without offering further explanation, the district court commented that "this case involves complicated First Amendment issues," that "there are simply too many factual questions here," that "plaintiffs have [not] made a clear showing of a likelihood of suffering irreparable harm," and that "the balance of equities in the public interest . . . slightly favor the district because preliminary injunctive relief would dramatically change the status quo" because "the district has a strong interest in controlling its schools." JA528-259.

## STANDARD OF REVIEW

The Fourth Circuit reviews the denial of a preliminary injunction "for abuse of discretion, reviewing the district court's factual findings for clear error . . . and its legal conclusions *de novo*." *League of Women Voters of N.C.*, 769 F.3d 224, 235 (4th Cir. 2014) (internal citations omitted). Abuse of discretion occurs when a district court "misapprehends or misapplies the applicable law." *Id.* Further, when a district court's ruling fails to make *any* particularized findings of fact and conclusions of law in its denial of a motion for preliminary injunction, it has abused its discretion. *Rullan v. Goden*, 782 F. App'x 285, 286 (4th Cir. 2019) (citing Fed. R. Civ. P. 52(a)).

## SUMMARY OF ARGUMENT

The district court abused its discretion when it denied Plaintiffs' motion for preliminary injunction without making particularized findings of

fact and conclusions of law as required by Fed. R. Civ. P. 52(a). The only question is whether to reverse the district court's order and grant Plaintiffs' motion or to vacate the district court's order and remand for further findings.

I.      Although a district court's failure to comply with Fed. R. Civ. P. 52(a) ordinarily results in remand, here the Court should review the undisputed documentary evidence in the record and grant Plaintiffs' motion for a preliminary injunction. It is undisputed that the District restricted access to *Stamped* in its libraries and banned use of *Stamped* in the classroom. Such action implicates Plaintiffs' First Amendment right to access information in their classrooms and school libraries. Video recordings of District board meetings show that the District's Board of Trustees did not advance a justification for removing *Stamped* that was "reasonably related to a legitimate pedagogical interest," *Kuhlmeier*, 484 U.S. at 273, nor did anyone allege that *Stamped* was causing or could cause a "substantial disruption" of the learning environment, *Tinker*, 393 U.S. at 513. To the contrary, the record shows that the Board ignored evidence that the book was squarely aligned with state educational standards and removed *Stamped* solely because of the Board's political desire to suppress the ideas about race and racism contained in the book. Because the documentary nature of the evidence allows this Court to "pass upon the facts as well as the trial court," *King v. C. I. R.*, 458 F.2d 245, 249 (6th Cir. 1972), the Court should reach into the record, conclude that the District has not met its burden to justify its restrictions on *Stamped*, and grant Plaintiffs' motion.

24

II.     In the alternative, the Court should, at minimum, vacate and remand with instructions about the proper legal standard that governs each of Plaintiffs' First Amendment claims. As the district court acknowledged, "this case involves complicated First Amendment issues." Indeed, the district court refused to announce a legal standard in its ruling and instead remarked that "it's clear that both sides can point to law that favors their arguments." Given that the Court reviews the district court's legal analysis *de novo*, it serves no purpose to ask the district court to announce its own legal standard. Remanding with instructions regarding the law that governs the merits of Plaintiffs' First Amendment claims will aid the parties and conserve judicial resources by ensuring that the facts found by the district court are subjected to the proper legal test.

III.     Finally, as a second alternative, Plaintiffs argue that the Court cannot affirm the district court's preliminary injunction ruling and must, at minimum, remand for the district court to make findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

## ARGUMENT

### I.     The Court should reverse the district court and grant Plaintiffs' motion for preliminary injunctive relief.

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 20 (2008). Because Plaintiffs satisfied each *Winter* factor based on undisputed documentary evidence, the Court should reverse the district court and grant Plaintiffs' motion for preliminary injunction.

    A.    <u>Plaintiffs established that they are likely to prevail on the merits.</u>

Plaintiffs' First Amendment right to access information in their libraries and classrooms was implicated by the District's removal of *Stamped* from District libraries and its prohibition on curricular use of *Stamped* in the classroom. To justify its restriction on students' access to *Stamped*, the District must show that its restriction on access comports with the transcendent imperatives of the First Amendment. Because the District failed to satisfy its burden below, Plaintiffs are likely to prevail on the merits. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (plaintiffs deemed likely to prevail where Government fails to meet its burden under First Amendment).

    **1.**    **The District's restriction on *Stamped* infringed on Plaintiffs' First Amendment right to access information in their classrooms and libraries without undue, viewpoint-based censorship.**

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. That is true both of students' right to speak as well as their corresponding right to access information. Indeed, it is "well established" that the First Amendment not only protects the right to speak and express ideas, but also the corresponding the "right to receive information and ideas." *Kleindienst v.*

26

*Mandel*, 408 U.S. 753, 762 (1972). This has been recognized "in a variety of contexts," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980), and is "'nowhere more vital' than in our schools and universities," *Kleindienst*, 408 U.S. at 763 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960))*; see also Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686 (D. Me. 1982) (compiling cases) ("The full force of the reasoning in these cases is particularly apposite in the educational environment of the secondary school library."). As a result, a student's right to receive information must receive equal protection as their right to speak. *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982) ("[T]he right to receive information and to be exposed to controversial ideas [is] a fundamental First Amendment right."); *see also, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 146-47 (1943) (because the right to receive information is "so clearly vital to the preservation of a free society," it "must be fully preserved."); *see also Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1251 (3d Cir. 1992) (discussing the history of the right to receive information and applying it to public libraries).

Although (to counsel's knowledge) this Court has yet to resolve a student's First Amendment challenge to a curricular prohibition or removal of a school library book, its established school-speech jurisprudence can be cleanly applied to both claims here. In the alternative, the Supreme Court's plurality opinion in *Pico* offers another test for evaluating Plaintiffs' library access claim.

27

i.    This Court's school-speech jurisprudence applies
      *Kuhlmeier* to the District's curricular prohibition and
      *Tinker* to its restriction on library access.

In *Tinker*, the Supreme Court ruled that the First Amendment only permits schools to restrict student speech that "materially and substantially disrupt[s] the work and discipline of the school." 393 U.S. at 513. According to this Court, that test is "the basic constitutional framework" for evaluating the First Amendment's protections against school-based censorship. *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013); *see also B.L. by and through Levy v. Mahanoy Area Sch. Dist.*, 376 F. Supp. 3d 429, 435 (M.D. Pa. 2019) *aff'd*, 141 S. Ct. 2038 (2021) ("*Tinker* thus sets the baseline for what student speech is protected.").

In the intervening decades, "the Supreme Court has created three exceptions . . . in which school officials may regulate student speech without undertaking *Tinker*'s substantial-disruption analysis." *Hardwick*, 711 F.3d at 435. The first was in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), where the Court held that a school may prohibit "offensively lewd," "obscene," and "vulgar," speech without establishing that such speech would result in a substantial disruption. *Id.* at 686. The second exception was announced in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), where the Court held that schools may exercise control over "school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Though the case arose from censorship of a school-sponsored school newspaper, other circuits have

applied *Kuhlmeier* to all curricular decisions. *See, e.g.*, *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1521-25 (11th Cir. 1989) (applying *Kuhlmeier* to a school board's removal of two written works—*The Miller's Tale* and *Lysistrata*—from the eleventh and twelfth grade curricula). Finally, the Supreme Court established a third exception in *Morse v. Frederick*, 551 U.S. 393 (2007), where it held that a school may censor speech that "can reasonably be regarded as encouraging illegal drug use." *Id.* at 397. Unlike *Kuhlmeier*, which has been read broadly, *Morse* is a narrow opinion. As explained in a separate concurrence by Justice Alito and joined by Justice Kennedy, *Morse* "provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422.

Taken together, the Supreme Court's school-based First Amendment jurisprudence consolidates into four rules:

> (1) Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language; (2) Under *Kuhlmeier*, a school may regulate school-sponsored speech on the basis of any legitimate pedagogical concern; (3) Under *Morse*, a school may categorically prohibit speech that can reasonably be regarded as encouraging illegal drug use; and (4) Speech falling outside of these categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others.

*Mahanoy*, 376 F. Supp. 3d at 436 (marks omitted) (quoting *Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.)).

29

Because Plaintiffs concede that the District's prohibition on use of *Stamped* in the classroom is "curricular," that claim is governed by *Kuhlmeier*. But because the District's restriction on library access to *Stamped* does not fall within any of the recognized exceptions to *Tinker*, that claim is controlled by the "substantial disruption" test. *See Hardwick*, 711 F.3d at 435, n.11 (denouncing *Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010), which treated a school's interest in "reducing racial tension" as comparable to the interest in *Morse* of preventing illegal drug use). As this Court explained in *Hardwick*, "[w]hile the Supreme Court is free to create exceptions to or even abandon *Tinker*'s substantial-disruption test, we must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise." *Id.*

ii.    <u>If the Court does not apply *Tinker*, it should apply *Pico* to the District's restriction on library access.</u>

In *Board of Education, Island Trees Union Free School District Number 26 v. Pico*, 457 U.S. 853 (1982), the Supreme Court heard its first and only challenge to the removal of a school library book.

In *Pico*, parents challenged a New York school district's removal of several books from its school libraries. 457 U.S. at 857-58. The removals arose after the board received complaints from "a politically conservative organization of parents." *Id.* at 856; *see also Pico v. Bd. of Educ.*, 474 F. Supp. 387, 389 (E.D.N.Y. 1979). While the school board reviewed the books

30

and considered its decision, the book-removal issue became highly politicized, with the board's conduct "insur[ing] that the impression would be created that freedom of expression in the District would be determined in some substantial measure by the majority's will." *Pico v. Bd. of Educ.*, 638 F.2d 404, 416 (2d Cir. 1980). After its evaluation, the book review committee concluded that several books were educationally suitable and recommended that nearly half of them be re-shelved. 457 U.S. at 857–58. But without further explanation, the school board rejected the committee's recommendations and voted to remove nine books it believed were "anti-American," "anti-Christian," and "just plain filthy." *Id.* at 857.

On summary judgment, the district court ruled for the school board, holding that the board's decision was "within the broad range of discretion constitutionally afforded to education officials." 474 F. Supp. at 398. The Second Circuit reversed, holding that the removal of materials from public school libraries triggers First Amendment scrutiny and that the school board was responsible for establishing that its action did not "unduly restricted protected speech to an extent greater than is essential." 638 F.2d at 416. Though one judge would have granted summary judgment for the plaintiffs, *id.* at 407, the majority concluded that remand was necessary "to develop a plenary record" concerning the board's motivation for removing the books and to provide plaintiffs "an opportunity to persuade a finder of fact that the ostensible justifications for defendants' actions—be it indecency or

31

ungrammatical usage, as one defendant suggested, or some other ground—were simply pretexts for the suppression of free speech," *id.* at 417.

On certiorari, a plurality of the Supreme Court affirmed the Second Circuit.[34] Justice Brennan, writing for the plurality, explained that "the special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." 457 U.S. at 868 (emphasis in original). As a result, the plurality concluded that the general discretion afforded to local school authorities to set curricula is diminished in the context of the school library:

> Petitioners emphasize the inculcative function of secondary education, and argue that they must be allowed unfettered discretion to "transmit community values" through the Island Trees schools. But that sweeping claim overlooks the unique role of the school library. It appears from the record that use of the Island Trees school libraries is completely voluntary on the part of students. Their selection of books from these libraries is entirely a matter of free choice; the

---

[34] Justice Blackmun wrote separately but agreed with the plurality that "school officials may not remove books from school libraries for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Pico*, 457 U.S. at 879–80 ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment."). The would-be fifth vote, Justice White, agreed that the Court should affirm the Second Circuit's opinion reversing the district court and remanding for further factfinding regarding "the reason or reasons underlying the school board's removal of the books," but felt that Court "should not decide [the] constitutional questions until it is necessary to do so." 457 U.S. at 883-84 (White, J., concurring in the judgment). Importantly, however, there would be no purpose in remanding for factfinding if there were *no* facts that could have established a violation of the First Amendment.

> libraries afford them an opportunity at self-education
> and individual enrichment that is wholly optional.

*Id.* at 869.

To explain its holding, the plurality offered two helpful examples of

facts which, if proven, would undoubtedly violate the Constitution:

> If a Democratic school board, motivated by party
> affiliation, ordered the removal of all books written by
> or in favor of Republicans, few would doubt that the
> order violated the constitutional rights of the students
> denied access to those books. The same conclusion
> would surely apply if an all-white school board,
> motivated by racial animus, decided to remove all
> books authored by blacks or advocating racial equality
> and integration.

*Id.* at 870-71.

Even the dissenters "cheerfully concede[d]" that such facts would

violate the First Amendment. *See id.* at 907-908 (Rehnquist, J., dissenting)

("I would save for another day—feeling quite confident that that day will not

arrive—the extreme examples posed in Justice BRENNAN's opinion").

The plurality summarized its rule in this way:

> In brief, we hold that local school boards may not
> remove books from school library shelves simply
> because they dislike the ideas contained in those books
> and seek by their removal to prescribe what shall be
> orthodox in politics, nationalism, religion, or other
> matters of opinion. Such purposes stand inescapably
> condemned by our precedents.

*Id.* at 872 (internal citations omitted).

33

Although *Pico* was a plurality opinion, it has been treated as strongly persuasive authority in other circuits. The plurality largely adopted the reasoning of cases before it, *see, e.g.*, *Right to Read Def. Comm. v. Sch. Comm. of Chelsea*, 454 F. Supp. 703 (D. Mass. 1978), and its holding has continued to be applied in subsequent cases, *see, e.g.*, *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) ("Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives."); *see also Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995).

Even courts that emphasize that *Pico* is nonbinding always stop short of rejecting its guidance. *See, e.g.*, *C.K.-W by and through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 915 (E.D. Mo. 2022) ("At this stage of the litigation, the Court will proceed under Justice Brennan's approach [in *Pico*.]"). In *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009), for example, the Eleventh Circuit considered the First Amendment implications of a Miami school district's removal of *Vamos a Cuba*, a book about life in Cuba, from its school libraries. The court underscored that "*Pico* is of no precedential value," but refused to treat removal of a library book as equivalent to a discretionary curricular decision. *Id.* at 1200–02 (distinguishing *Kuhlmeier*) ("[T]his is not a school newspaper situation, and the speech at issue does not form part of a course of study in a

34

school's curriculum. This is a school library book case."). And at the end, the Eleventh Circuit (without explicitly saying so) functionally applied *Pico*: "the real issue for the federal courts . . . is whether the Board's decision to remove the book from school library shelves was motivated by its inaccuracies concerning life in Cuba or by a desire to promote political orthodoxy and by opposition to the viewpoint of the book." *Id.* at 1227; *but see id.* at 1202 ("The question of what standard applies to school library book removal decisions is unresolved.").

### 2. The District did not carry its burden to show that its prohibition on curricular use of *Stamped* was reasonably related to a legitimate pedagogical interest.

Local school authorities are generally entitled to broad discretion to decide what materials are taught in the classroom. But "notwithstanding the power and discretion accorded them, school boards do not have an absolute right to remove materials from the curriculum." *Pratt*, 670 F.2d at 776.

When, as here, a school board removed a material from curricular use, it must show that its actions were "reasonably related to legitimate pedagogical concerns." *See Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015) (applying the test from in *Kuhlmeier*, 484 U.S. 260 (1988)); *Virgil*, 862 F.2d at 1521–22 (same); *McCarthy v. Fletcher*, 207 Cal. App. 3d 130, 145–46 (Cal. Ct. App. 1989) (same); *see also Pratt*, 670 F.2d at 777 (requiring, before *Kuhlmeier*, that the school board "establish that a substantial and reasonable

35

governmental interest exists for interfering with the students' right to receive information.").

Under this rule, the Defendant was required establish two factual elements in the district court: (1) that its removal decision was motivated in fact by a legitimate pedagogical concern; and (2) that its removal decision was reasonably related to that concern. *See, e.g.*, *McCarthy*, 207 Cal. App. 3d at 142–43 (applying *Kuhlmeier* and remanding for factfinding where "two rational but conflicting interpretations as to the motivation [of the board] may be drawn."); *see also Case*, 908 F. Supp. at 875 ("[T]he court must determine the 'actual motivation' of the school board members in their removal decision."); *Campbell*, 64 F.3d at 191 (remanding for district court to determine the "actual motivation" behind the school board's book removal). The District failed to make either showing.

The Board first claimed that it removed *Stamped* because it was an "opinion piece," but later pivoted, asserting it removed *Stamped* because of "factual errors and omissions." *See supra*, Statement of Facts ("SOF"). Neither justification withstands scrutiny under *Kuhlmeier*.

First, unlike the school- and District-level book review committees, which evaluated the text against the state curricular standards and considered the teacher's intended use of the book, JA128–130, JA134–135, the Board's discussion ignored both the South Carolina's educational standards and the purpose of the book's inclusion in the curriculum, 9/22/26 Board Meeting at 2:13:53–2:28:47. The Board initially claimed it prohibited

*Stamped* in the classroom because of the opinions contained in the book. *See, e.g.*, *id.* at 2:23:26 ("[T]his is an opinion piece. I read it. It doesn't belong in the classroom."). But state standards *require* students to read and analyze persuasive and rhetorical writing. *See, e.g.*, JA94 (English III Standards) ("Analyze and critique the reasoning in historical, scientific, technical, cultural, and influential argument writing."). The removal decision therefore fails the first part of the *Kuhlmeier* test because there is no evidence that the Board was motivated by a legitimate pedagogical interest.

Even assuming *arguendo* that the District articulated a legitimate pedagogical interest in suppressing access to *Stamped*, there is no support for why *removing* the book altogether was "reasonably related" to that concern. *See Kuhlmeier*, 484 U.S. at 273. It is undisputed that parents received notification when the book was being used and had the opportunity to choose an alternative for their child. *See* JA128. Given that students were not required to read the book if their parents did not consent, it is difficult to imagine how prohibiting the book's use could be justified as "reasonable."

Likewise, the District's *post hoc* justification for removing *Stamped* is factually incredible and legally insufficient. In addition to partially reinstating *Stamped*, Board members took an additional step to avoid liability. In a transparent attempt to mirror the facts of *ACLU of Florida*, 557 F.3d 1177, six Board members submitted sworn declarations stating that they voted to remove *Stamped* because of their opinion about the book's "factual errors and omissions." Based on that previously unmentioned

37

rationale, the District argued that Plaintiffs cannot show that Defendant violated the First Amendment by impermissibly censoring *Stamped*. For two reasons, the Court should reject the District's new "factual errors and omissions" rationale.

To start, the District's evidence for this justification is simply not believable. The constitutionality of the District's censorship depends on the "actual motivation" of the Board, *Case*, 908 F. Supp. at 875, and cannot be satisfied by a rationale that was "hypothesized or invented *post hoc* in response to litigation," *United States v. Virginia*, 518 U.S. 515, 533 (1996) (rejecting VMI's *post hoc* justification for excluding women). Here, unlike in *ACLU of Florida*, 557 F.3d 1177 (11th Cir. 2009), where there was ample evidence that the factual accuracy of *Vamos a Cuba* was an overriding contemporaneous concern of the school board, *id.* at 1207-08,[35] not one SDPC board member even *mentioned* the factual accuracy of *Stamped* during its deliberations on September 26, 2022. *See generally* 9/26/22 Board Meeting. Against that record, the Court should reject Defendant's newly scripted factual allegation as incredible.

---

[35] Even on that record, it was a close call. Of the four judges (one district court judge and three Eleventh Circuit judges) that evaluated the record in *Miami-Dade*, two concluded that *Vamos a Cuba* was removed to enforce a politically orthodox view and two concluded that it was removed because of a legitimate pedagogical interest in ensuring factual accuracy. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 439 F. Supp. 2d 1242 (S.D. Fla. 2006) (granting preliminary injunction), *rev'd by ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (reversing 2-1, with dissent by Judge Wilson).

The rehearsed and coordinated nature of the declarations is additionally suspicious. Of the six declarations submitted by the District, five contain six identical paragraphs,[36] including this one:

> My decision to vote on September 26, 2022 to remove *Stamped* from the curriculum, library, and media centers of School District of Pickens County high schools was the result of my analysis of the factual errors and omissions in *Stamped* and my conclusion that, as a result of these factual errors and omissions, the book is not intellectually appropriate or educationally suitable for students in the School District of Pickens County.

JA190–192 (Garrison Decl.), JA194–195 (Swords Decl.) (same), JA197–198 (Bowers Decl.) (same), JA200–201 (Haskett Decl.)(same), JA203–204 (Kelley Decl.) (same). Dr. Bagley includes a substantively similar paragraph in her declaration, but with minor modifications. JA186–188 (Bagley Decl.).

In a variety of contexts—including book removal cases—federal courts have disparaged the reliability of after-the-fact, *post hoc* justifications like the one advanced by Defendant. *See, e.g.*, *Pratt*, 670 F.2d at 778 (rejecting the School Board's alleged concerns, raised during litigation, about violence in the use of a particular film in schools and its "conclusory resolution reciting its purported concern about violence without any support"); *Virginia*, 518 U.S. at 533 (resolving whether VMI's exclusion of women violates equal protection); *St. Michael's Media, Inc. v. Mayor & City Council*

---

[36] *Compare* JA191 at ¶¶ 8-13 *with* JA195 at ¶¶ 9-14, JA198 at ¶¶ 6-11, JA200–01 at ¶¶ 4-9.

*of Baltimore*, 566 F. Supp. 3d 327, 373 (D. Md. 2021) (First Amendment viewpoint discrimination). And in the administrative context, agency actions must be justified by the rationale advanced *at the time of the action* and cannot be salvaged by *post hoc* justifications. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1908 (2020).

Beyond its factual incredibility, the Board's newly identified concern about unspecified factual errors is also unpersuasive because it lacks relevance to the book's educational suitability. Unlike math and history textbooks that are written to convey specific factual information, *Stamped* is a work of persuasive writing that articulates and then defends a specific, opinion-ladened argument. As highlighted by the school- and District-level book review committees that reviewed *Stamped* (and recommended its use), the book was assigned as part of a curriculum designed to encourage critical thinking, identification of point-of-view, and understanding of rhetoric. In that context, the Board's newly identified concern with strict historical accuracy does not diminish the book's educational suitability and thus does not, under the circumstances, amount to a "legitimate pedagogical interest."

The Eighth Circuit's evaluation of similar facts in *Pratt*[37] is illustrative. In *Pratt*, as here, the school board removed materials from the school curriculum without identifying during its deliberation "any cognizable, credible evidence as to any legitimate reason for excluding [the materials]

---

[37] Although the Eighth Circuit's opinion in *Pratt* pre-dates *Kuhlmeier*, its analysis of nearly identical facts is still instructive.

40

other than the fact that the School Board and certain elements of the
populace objected to the ideas disseminated therein." 670 F.2d at 778. In
*Pratt*, as here, the school board's decision to remove the materials overrode
the official recommendation of objective curricular review committees. *Id.* at
774-75. And in *Pratt*, as here, the school board attempted to justify its
removal decision based on a *post hoc* rationale. *Id.* On those facts, the Eighth
Circuit affirmed the district court's rejection of the "the self-serving
statements of the school board, made after the fact and not based on the
previous record," *id.* at 778, and agreed that "the appellant has failed to
carry its burden of establishing that a substantial governmental interest
existed for interfering with the students' right to receive information," *id.* at
779. Here, too, Defendant has failed to carry its burden.

3.     **The District did not meet its burden under *Tinker* or *Pico*
       to justify its restriction on access to *Stamped* in the
       library.**

The First Amendment is even less tolerant of censorship in the library
than it is in the classroom. *Romano v. Harrington*, 725 F. Supp. 687, 690
(E.D.N.Y. 1989) ("[I]nroads on the First Amendment in the name of
education are less warranted outside the confines of the classroom and its
assignments."); *ACLU of Fla.*, 557 F.3d at 1202 (refusing to apply the more
deferential *Kuhlmeier* test to removal of a book from the school library). As
a result, the District's decision to remove *Stamped* from SDPC libraries
"must withstand greater scrutiny within the context of the First Amendment

41

than would a decision involving a curricular matter."[38] *Campbell*, 64 F.3d at 189.

This district court could have applied one of two analytical frameworks for evaluating Defendant's removal of *Stamped*: *Tinker* or *Pico*. *See supra*, Part I.A.1. Under either standard, Defendant's decision violated the First Amendment. Yet, the district court applied neither standard (nor any other First Amendment framework) to Defendant's censorship of its school libraries.

    i.    <u>The District's removal of *Stamped* violates *Tinker*.</u>

Defendant's removal of *Stamped* fails the substantial-interference test. Under *Tinker*, "a mere desire to avoid discomfort and unpleasantness [is] an insufficient basis to regulate speech; there ha[s] to be disruption in the sense that the speech would materially and substantially interfere with . . . the operation of the school." *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565, 572 (4th Cir. 2011). There is no evidence of such disruption here. To the contrary, *Stamped* was assigned reading in at least one English III classroom in the District, *see* JA107, and did not cause any known instances of disruption or interference. Moreover, the views expressed in *Stamped* are no more disruptive, inflammatory, or divisive than the black armbands worn by John Tinker and his classmates to protest the Vietnam War, *Tinker*, 393 U.S. 503,

---

[38] Given that the District's removal of *Stamped: Racism, Antiracism, and You* from the classroom cannot survive scrutiny under *Kuhlmeier*'s more deferential test, *see supra* Part I.A.2, the book's removal from the library—which is subject to more rigorous scrutiny—must certainly violate the First Amendment.

or the Confederate flag shirts and protest shirts sought to be worn by Candice Hardwick, *Hardwick*, 711 F.3d 426. Because there is no evidence that mere access to *Stamped* has caused or will cause the sort of disruption contemplated by *Tinker*, the District cannot "prohibit the [availability] of one particular opinion," *Tinker*, 393 U.S. at 511, by removing *Stamped* from its library shelves and media centers.

ii.    The District's removal of *Stamped* violates *Pico*.

If the Court finds that removal of school library books is an exception to *Tinker*'s substantial disruption requirement, then the Supreme Court's analysis in *Pico*—which prohibits removal when it is decisively motivated by a desire to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of public opinion," 457 U.S. at 872—should control, *see, e.g.*, *Case*, 908 F. Supp. at 875.

Like in *Pico*, the challenge to *Stamped* was initiated and propelled by a politically conservative parent group—here, Moms for Liberty—with assistance from explicitly political groups and individuals, like Conservatives of the Upstate, and Freedom Caucus representative Thomas Beach. *Compare Pico*, 457 U.S. at 856 *with* SOF I.D. Like the book challengers in *Pico*, challengers to *Stamped* chastised its contents as "anti-American" and "anti-Christian." *Compare Pico*, 457 U.S. at 857 *with, e.g.*, 8/22/22 Board Meeting at 1:20:28. Challengers especially emphasized their belief that

43

*Stamped* should be removed because of its supposedly Marxist[39] leanings. JA111; 8/22/22 Board Meeting at 1:20:28, 1:31:23; 9/26/22 Board Meeting at 1:23:32.

Like *Pico*, the challenge to *Stamped: Racism, Antiracism, and You* was overtly politicized during the District's evaluation of the book. *See Pico*, 638 F.2d at 416. Thomas Beach, a state representative from Pickens County, publicly warned the Board that refusing to remove the book would trigger the ire of the state's Freedom Caucus. 8/22/22 Board Meeting at 1:27:10. And following the District's decision to remove *Stamped*, political groups celebrated the decision as their own victory. *See supra* SOF I.D. One Board member, Amy Williams, even posted a personal op-ed to the COTU website to discuss the "inappropriate" books available in the District.[40] Together, these facts leave the troubling and indelible impression "that freedom of expression in the District would be determined in some substantial measure by the majority's will." *Pico*, 638 F.2d at 416.

Even Defendant's treatment of its book review committees mirrors *Pico*. Like in *Pico*, the District convened a committee to evaluate *Stamped*'s age appropriateness and educational suitability. Then, like in *Pico*, the Board ignored and overrode the committee's recommendation. *Compare Pico*, 457 U.S. at 857-58 ("The Board substantially rejected the Committee's report.")

---

[39] Marxist refers to "the political, economic, and social principles and policies advocated by [Karl] Marx." "Marxism," Merriam-Webster.com Dictionary (last 6/6/23), https://www.merriamwebster.com/dictionary/Marxism.

[40] Williams, *supra* note 11.

44

*with* 9/26/22 Board Meeting at 2:13:53–2:28:47 (not discussing the committees' findings before rejecting them).

Taken together, the facts show that *Stamped* was removed for reasons that are impermissible under the First Amendment. The Board failed to articulate any basis for removing *Stamped* that was even nominally related to the book's educational suitability. Instead, vague comments by board members about the "opinions" in the book strongly indicate that the Board members were embracing the explicit viewpoint discrimination of the groups and individuals that were pushing for removal. *See Pratt*, 670 F.2d at 778-79 (inferring from Board's lack of contemporaneous reliance on legitimate pedagogical interest that it was adopting the challengers' ideological opposition to the challenged material). Understood in that way, it is clear that *Stamped* was removed exclusively because of political hostility to the views and opinions expressed in the book and a desire to keep the District's students—including Plaintiffs—from being exposed to those opinions.

Given that *Pico* is well-reasoned, routinely followed, and has been left undisturbed by the Supreme Court for the last forty years, this Court would be on solid ground to apply it here. *See Case*, 908 F. Supp at 875 (concluding that the court "should follow the *Pico* decision" because it is "the only Supreme Court decision dealing specifically with the removal of books from a school library" and "there are no Tenth Circuit Court of Appeals decisions directly on point"); *but see supra* Part I.A.1(i) (explaining that, under Fourth

45

Circuit's school speech precedent, this case is controlled by the substantial disruption test from *Tinker*).

### 4. The Board's partial reinstatement of *Stamped* in District libraries does not preclude preliminary injunctive relief.

In response to this lawsuit, the Board went into executive session on July 6, 2023, (ten days after Plaintiffs moved for preliminary injunction) and voted to reinstate *Stamped* in the District's high school libraries, subject to parental consent. Based on its partial reinstatement of *Stamped*, the District argued below that Plaintiffs lack standing, that their claims are moot, and that their injuries are no longer sufficiently imminent to warrant preliminary relief. On each argument, Defendant misses the mark.

To start, reinstating *Stamped* subject to a parental consent requirement still imposes a restriction on students' access to the book that the District has failed to justify. *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003) (enjoining school's parental consent requirement for access to Harry Potter books). But in any event, standing is evaluated at the commencement of an action, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000), and thus cannot be eliminated by a defendant's subsequent conduct. Defendant's mootness argument fares no better because the District failed to show—indeed, *cannot* show—under the doctrine of voluntary cessation, that its policy change is permanent. *Id*. at 189. And finally, because the District's partial library reinstatement does not remove the curricular censorship faced by Plaintiffs

46

Turner and Laurence, Plaintiffs continue to face an imminent threat of irreparable injury that demands relief.

>    B.    <u>Plaintiffs established they are likely to suffer irreparable harm absent preliminary relief.</u>

"The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That is undoubtedly true in this circuit, where First Amendment violations are treated as "per se irreparable injur[ies]." *Bergland*, 586 F.2d at 995 *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018).

Here, Plaintiffs represent the interests of six individual students in the School District of Pickens County. The District's action restricted J.T., H.L., S.K., and R.K.'s access to *Stamped* in their school library. Also because of the District's action, J.T. and H.L. are not being assigned *Stamped* as part of their English III Honors curriculum. Because these are cognizable First Amendment violations, Plaintiffs have established irreparable harm under *Winter*.[41]

---

[41] The district court ruled, without any explanation, that "I don't think plaintiffs have made a clear showing of a likelihood of suffering irreparable harm in the absence of preliminary relief." JA259 at 5–7. This was an abuse of discretion because, like the court's other rulings, it lacked any findings of fact or conclusions of law sufficient to explain its ruling to the parties or create a reviewable record.

47

C.    <u>Plaintiffs established both that the balance of equities and the public interest favor preliminary injunctive relief.</u>

Because Plaintiffs demonstrated likelihood of success on their First Amendment claims, *see supra*, the remaining *Winter* factors follow suit. As several circuits have explained, "in the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

"In cases involving significant public interest, courts may consider the balance of the equities and the public interest factors together." *Thomas v. Andino*, 613 F. Supp. 3d 926, 954 (D.S.C. 2020) (cleaned up). This Court has held that these "factors [are] established when there is a likely First Amendment violation," as is the case here. *Centro Tepeyac*, 722 F.3d at 191.

By contrast, the District is "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Instead, "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012).

48

Furthermore, it is well established that the public interest favors protecting constitutional rights, such as the First Amendment rights at issue here. *See Giovani Carandola, Ltd.*, 303 F.3d at 521. That is especially true here, where the public maintains "an interest in public schools being able to teach students using a thoughtfully established curriculum." *Coble v. Lake Norman Charter Sch., Inc.*, 499 F. Supp. 3d 238, 249 (W.D.N.C. 2020).

D.    Outright reversal, instead of remand, is appropriate because the undisputed documentary evidence demonstrates that Plaintiffs satisfied the *Winter* factors.

When, as here, the district court fails to make adequate findings of fact under Fed. R. Civ. P. 52(a), the Court generally remands for fact finding. *See, e.g.*, *Booker v. Timmons*, 644 F. App'x 219 (4th Cir. 2016) (per curiam) (vacating order denying preliminary injunction). But as several other circuits have recognized, remand is not always required. For example, "a remand is unnecessary if all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court." *King*, 458 F.2d at 249. Likewise, the Court "need not remand" when the material facts "are largely undisputed," and "application of the correct standard could support only one conclusion." *Spartan Concrete Products*, 929 F.3d at 111 n.1 (quoting *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010)); *see also Genovese Drug Stores, Inc. v. Conn. Packing Co., Inc.*, 732 F.2d 286, 292 (2d Cir. 1984) ("On the undisputed facts, Fotomat is entitled to have the preliminary injunction vacated."); *Sbicca-Del Mac, Inc. v.*

49

*Milius Shoe Co.*, 145 F.2d 389, 400 (8th Cir. 1944) ("Since the facts relied upon to support these two defenses are in the record and undisputed we shall not remand the case for [noncompliance with Fed. R. Civ. P. 52(a)] alone but will in the exercise of our jurisdiction under such circumstances consider and determine them."); 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2577 (3d ed. 2008) (noting that although "the appellate court may not make new findings on the basis of evidence that the trial court did not hear," "a remand may be unnecessary if all the evidence is documentary or if the facts are undisputed.").

Here, all of the material facts that support Plaintiffs' motion for preliminary injunction are established through documentary evidence: the "Board packet" that contains the Board's final decision along with the written findings by the school- and District-level review committees and the videos showing the Board's August 22 and September 26 Board meetings. Other material facts, like that Plaintiffs attend school in the District, are undisputed.

Despite that, the district court opined below that "there are several questions of fact that need to be resolved." JA259. But only *relevant* factual disputes must be resolved before a preliminary injunction may enter. Here, because the arguments raised by the District did not inject factual uncertainty into Plaintiffs' legal claims or otherwise disturb the legal effect of

50

the undisputed and documentary evidence relied upon by Plaintiffs, the

Court is not required to remand for additional factfinding.[42]

## II. In the alternative, the district court's order should be vacated and remanded with instructions to apply *Kuhlmeier* to Plaintiffs' curricular claim and *Tinker* or *Pico* to Plaintiffs' library removal claim.

If the Court does not grant Plaintiffs' motion for preliminary injunction

and determines that there are unresolved questions of fact, it should vacate

and remand with instructions.

To counsel's knowledge, this Court has not addressed what legal

standard governs a students' challenge to the removal of a school library

book or a prohibition on use of a particular book in the classroom.[43] It is not

clear what First Amendment standard—if any—the district court applied to

Plaintiffs' claims. But because the Court will review the district court's legal

analysis *de novo*, it benefits both the district court and the parties for this

Court, if it remands, to do so with instructions for what legal standards

govern Plaintiffs' claims.

---

[42] The Defendant District appears to agree that the Court can reach into the record and decide the matter "on the merits." *See* Dkt. 13 at 22-24 (arguing that "the Court can conduct a meaningful appellate review of the issues, evidence, and arguments discerned from the Record.").

[43] *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364 (4th Cir. 1998), cited heavily by Defendant below, does not address the First Amendment rights of *students*. "The only issue in [*Boring*] is whether a public high school teacher has a First Amendment right to participate in the makeup of the school curriculum through the selection and production of a play." *Id.* at 366. Because *Boring* was resolved on established rules governing employee speech, its analysis is irrelevant here.

51

For reasons argued above, *supra* Part I.A, Plaintiffs urge this Court to hold that: (1) prohibiting a book's curricular use implicates students' First Amendment right of access and requires a showing, by the Defendant, that the curricular censorship is "reasonably related to a legitimate pedagogical interest;" and (2) that removing a book from a school library implicates students' First Amendment right of access and requires a showing, by the Defendant, that the book's mere availability is likely to cause a "substantial disruption" and "interference with school activities . . . and discipline," *Tinker*, 393 U.S. at 513, or that the book's removal was not decisively motivated by a desire to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of public opinion," *Pico*, 457 U.S. at 872.

## III. At minimum, the district court's order denying relief should be vacated and remanded for compliance with Fed. R. Civ. P. 52.

Compliance with Fed. R. Civ. P. 52(a) "is of the highest importance." *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940). As this Court has routinely explained, Fed. R. Civ. P. 52(a) requires the district court's decision to be supported by a full, written explanation of its particularized findings of fact and conclusions of law. Fed. R. Civ. P. 52(a); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999). This rule "allows the parties to better understand the reasons for the court's actions," and protects the losing party's right to seek "meaningful review of that decision." *Hoechst Diafoil Co.*, 174 F.3d at 423; *see also*

52

*Rullan*, 782 F. App'x at 286 (citing Fed. R. Civ. P. 52(a)). When a district court's preliminary injunction order lacks the particularized findings of fact and conclusions of law, this Court is "constrained to conclude that the district court abused its discretion." *Booker*, 644 F. App'x 219; *Bratcher v. Clarke*, 725 F. App'x 203, 206 (4th Cir. 2018); *Rullan*, 782 F. App'x 285.

As argued here and in Plaintiffs' Motion for Summary Disposition, the district court's abuse of discretion is plain from its failure to comply with Fed. R. Civ. P. 52(a). Notably, Defendant does not identify a single case where this Court upheld an injunction order without written findings of fact and conclusions of law. Therefore, if the Court determines that there are disputes of material fact, it should, at minimum, vacate and remand for the district court to make particularized findings of fact and conclusions of law.

## CONCLUSION

The district court abused its discretion by denying Plaintiffs' motion for preliminary injunction and for doing so without making any factual findings or articulating the legal standard it was applying to Plaintiffs' claims. As result, Plaintiffs ask this Court, based on the documentary and undisputed evidence, to **reverse** the district court and **grant** Plaintiffs' motion for preliminary injunction. If the Court determines, however, that there are outstanding disputes of material fact, Plaintiffs ask the Court to **vacate** and **remand** with instructions.

53

Dated: October 4, 2023

Respectfully submitted,


**ACLU OF SOUTH CAROLINA**          **NAACP**

*/s Allen Chaney*                    Anna Kathryn Barry
_____                 4805 Mt. Hope Drive
Allen Chaney                         Baltimore, MD 21215
P.O. Box 1668                        Tel: (410) 580-5777
Columbia, SC 29202                   abarnes@naacpnet.org
Tel: (864) 372-6681
achaney@aclusc.org

54